THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MARK SURLES, Defendant-Appellant.

First District (5th Division)  No. 81—2839

Opinion filed July 20, 1984.

Steven Clark, of State Appellate Defender's Office, of Chicago (Julius Lucius Echeles, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and James J. Bigoness, Assistant State's Attorneys, of

counsel), for the People.

PRESIDING JUSTICE MEJDA* delivered the opinion of the court:

Following a jury trial, defendant was convicted of armed robbery and armed violence (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2, 33A—2, respectively), and sentenced to 20 years in the Illinois Department of Corrections. Defendant appeals, contending that: (1) the suggestive show-up prior to defendant's arrest so tainted the subsequent photographic and in-court identifications of defendant by complainant as to render them inadmissible; (2) the State's inflammatory and factually erroneous statements made to the jury during closing argument prejudiced defendant's right to a fair trial; (3) the State failed to prove defendant guilty beyond a reasonable doubt; (4) defendant was erroneously convicted of two offenses carved from a single act; (5) the trial court erred in enhancing defendant's sentence for perjury it perceived during the course of the trial; and (6) the trial court erred in imposing a general sentence where there had been a conviction on two counts. For the reasons that follow, we affirm the conviction for armed robbery, vacate the conviction for armed violence and remand the cause for new sentencing.

Prior to trial, defendant moved to suppress complainant's identification testimony on the ground that complainant was allowed to improperly view defendant in a one-on-one show-up which, in turn, tainted the subsequent photographic identification. In particular, defendant argued that in the early morning hours of June 6, 1980, shortly after the grill at which complainant worked had been robbed, complainant was taken to the scene of an automobile accident by the police for the sole purpose of identifying defendant, driver of one of the automobiles involved in the accident, as the robber. Upon arriving at the accident scene, complainant was informed that the passengers had been taken to St. Anthony's Hospital in Chicago. The police officer then drove complainant to the hospital, where she was taken to the police room. While sitting in the police room, complainant had her back to the doorway. However, she happened to turn toward the doorway just as defendant was wheeled by on a stretcher by hospital personnel. Complainant denied that she was directed by anyone to look toward the door at that particular moment. When she saw defendant, complainant unhesitatingly and voluntarily told the police officer that he was the man who had robbed the grill. The following day, com-

---

*Justice Wilson, who authored the original opinion, is now deceased.

plainant was shown a photographic lineup at the Forest View police station from which she identified photos of both defendant and his companion, Freddie Anderson.

In an attempt to demonstrate an independent basis for the photographic identification, complainant testified on behalf of the State that on June 6, 1980, approximately 1:30 a.m., she was working by herself at Ed's Grill in Forest View when defendant and a companion entered the grill, each carrying a sawed-off weapon. Defendant sat down at the counter and told complainant that this was a "stick up." The grill was well-lit with fluorescent lights, enabling complainant to have a clear view of defendant. After defendant and his companion left the grill with the money from the cash register, complainant immediately called the police. When they arrived, she described defendant as a black male, approximately six feet tall, 175 pounds, between 25 and 30 years old, with a mustache, medium afro, no scars, wearing blue jeans and no shirt. In addition, complainant told the police that she had seen defendant at the grill several times prior to the robbery. However, she did not know his name.

At the conclusion of testimony, the trial court granted that portion of defendant's motion requesting suppression of the hospital identification, but denied that portion requesting suppression of the subsequent photographic identification. In so ruling the court found that the hospital identification was unnecessary and suggestive, but that complainant's prior acquaintance with defendant established an uninfluenced, independent basis for the photographic identification and any subsequent in-court identification.

Thereafter, defendant moved that the evidence of the reckless homicide be suppressed, arguing that the reckless homicide and the armed robbery were not connected in any way and that information of the death of a 16-year-old in the other car would severely prejudice defendant. The trial court ruled that evidence of the reckless homicide was admissible to show flight, but that no evidence could be presented regarding the death of or injuries to anyone involved in the accident.

At trial, complainant testified that she was employed at Ed's Grill, 4700 South Laramie, Forest View, as a short-order cook and waitress. On June 6, 1980, she worked the 10 p.m. to 6 a.m. shift by herself. Approximately 1:30 a.m. that day she was sitting at the counter on the customer side, looking at a quilting magazine entitled "Craft," when defendant and a companion entered the grill. There were no other customers in the grill at the time. Complainant recognized defendant, but not his companion. She did notice, however, that his companion was wearing a blue jean jacket with the word "Zak

[*sic*]" written across the back on a faded decal, blue jean pants and was carrying a "shiny light brown gun" that looked like a sawed-off rifle or shotgun, but was smaller than the "dirty long sawed-off shotgun" carried by defendant. After defendant demanded the money from the register, complainant handed him all the cash and dumped the change from the change drawer into the "Craft" magazine which was laying open on the counter. Defendant picked up the magazine and left with his companion. Approximately $178 had been taken.

Shortly after she notified the Forest View police of the robbery, Officer Glenn David arrived at the grill and drove complainant to the scene of an accident in Chicago. From there, they went to St. Anthony's Hospital. In the hospital parking lot, complainant was directed to look in the trunk of a Chicago police squad car where she saw the two guns used in the robbery, the blue jean jacket worn by defendant's companion, and some change in a brown paper bag.

The following day, approximately 2 p.m., complainant met Officer David at the Forest View police station where she viewed a photographic lineup of eight photos of male Negroes. From these photos, complainant identified defendant and his companion. At this point in her testimony, complainant made an in-court identification of defendant as the man who robbed the grill. Further, she identified the guns used by defendant and his companion during the robbery, the jacket worn by the companion at the time of the robbery, the magazine in which she had put the change from the change drawer, a photo of the photographic lineup from which she identified defendant and his companion, and the photos themselves that she had identified at the lineup.

On cross-examination, complainant stated that she had told the Forest View police that she recognized defendant as a previous customer at the grill, but she did not specifically tell the police that she had waited on defendant 20 times. She first saw defendant in the grill approximately five years ago and remembered him because he had been extremely arrogant and hostile on several occasions over the five-year period. In fact, she had called the police twice because of defendant's unruly behavior. However, each time defendant left the grill before the police arrived. Complainant had not heard or seen a car leaving the area of the grill after the robbery.

Next, Frank Miulli, Chicago firefighter paramedic, testified that on June 6, 1980, approximately 3:30 a.m., he was dispatched to the scene of an automobile accident in the area of 18th and Pulaski. When he arrived at the scene, he saw a brown vehicle and a white vehicle. Defendant was conscious and seated in the driver's seat of the brown

vehicle, wearing blue jeans and no shirt. The passenger, wearing a blue jean jacket and blue jeans, was sprawled across the front seat, unconscious.

After Miulli removed defendant from the vehicle, defendant told him that he wanted to get some money that he had left on the passenger side. Miulli then walked over to the passenger side where his partner shone a flashlight inside the car to locate the money. At that point, the partner spotted two sawed-off weapons which he gave to the Chicago police officer at the scene. On the witness stand, Miulli identified the guns removed from defendant's automobile and the blue jean jacket worn by defendant's companion.

Officer Daniel Chorowicki of the Chicago police department then testified that on June 6, 1980, approximately 3:30 a.m., he was at the scene of an automobile accident in the vicinity of 16th and Pulaski when he observed a paramedic recover two sawed-off weapons from a brown vehicle and hand them to a Chicago police officer who put them in the trunk of his squad car. At that time, Chorowicki remembered a message he had heard on his radio a few hours earlier regarding a Forest View robbery committed by two male Negroes carrying sawed-off weapons. After calling dispatch for a more detailed description of the offenders, Chorowicki told the other Chicago police officers at the scene that he believed the two men in the brown vehicle were wanted in connection with an armed robbery in Forest View. At this point in his testimony, Chorowicki identified the weapons removed from the brown vehicle by the paramedic, the jacket worn by defendant's companion, and made an in-court identification of defendant as the driver of the brown vehicle.

Next, Officer Gary Zuelke of the Chicago police department testified that on June 6, 1980, approximately 3:30 a.m., he observed a brown Chevrolet proceeding the wrong way down a one-way street. When he attempted to curb the vehicle for the traffic violation, the Chevrolet sped off at a high rate of speed. Zuelke then activated his emergency siren and lights and proceeded to chase the speeding car. From the moment that he first observed the brown vehicle until he saw it collide with another car, Zuelke never lost sight of it. At the scene of the accident, Zuelke observed two people in the brown vehicle, one of whom he identified at trial as defendant.

Zuelke further testified that he observed a paramedic lean into the brown vehicle and find two sawed-off weapons, which he handed to Zuelke. After unloading the weapons, Zuelke placed them in the trunk of his squad car. At this point in his testimony, Zuelke identified the weapons found in the brown vehicle. Zuelke further stated that

when he observed the occupants of the brown vehicle, he noted that the driver was wearing blue jeans and no shirt and the passenger was wearing blue jeans, no shirt and a blue jean jacket with the word "Zap" written across the back. After searching the brown vehicle, Zuelke recovered approximately $100 from the floor, put the money in a brown paper bag and placed the bag in the trunk of his squad car. Upon arriving at St. Anthony's Hospital, Zuelke was given a blue jean jacket with the word "Zap" written across the back, which he also put into his trunk. While at the hospital, Zuelke met complainant, who accompanied him to his squad car to look at the items in his trunk, i.e., sawed-off weapons, jacket and money. Zuelke then identified the weapons and the jacket he had shown to complainant and the magazine he had observed on the floor of the brown vehicle.

On cross-examination, Zuelke stated that he had found only $18.76, primarily in change, scattered on the floor of the car. Further, the brown vehicle was not registered to defendant. Rather, it had been taken in an armed robbery.

After the State rested its case, defendant's motion for a directed verdict was denied.

Next, Mark Surles, defendant, testified that on the evening of June 5, 1980, he was drinking with some friends at the park at 55th and Shields in Chicago. Approximately 2:30 a.m. the following morning, while on his way to a tavern at 54th and Shields, defendant noticed an empty car, with its motor running, parked near the tavern. He entered the car and drove off to pick up his friend, Freddie Anderson. Later, on the way to his own house to pick up some more money, defendant noticed a police squad car and immediately sped away. He never saw any weapons or money in the car. At that point in his testimony, defendant identified a photo of the brown vehicle involved in the automobile accident as the automobile he had stolen.

Defendant denied ever having been in Ed's Grill, ever having seen the sawed-off weapons prior to trial, and denied robbing the grill on June 6. Further, defendant stated that he did not remember whether Anderson had been wearing a blue jean jacket on June 6. However, he did recall that on that date he had been wearing white gym shoes, blue jeans and a faded blue T-shirt which the paramedic had removed immediately after the accident. Defendant further recalled seeing the police search the brown vehicle, but did not see them recover anything.

On cross-examination, defendant admitted to going on a joyride in the early morning hours of June 6, 1980, and admitted that he had been conscious when the paramedics took the weapons from the car.

Defendant further indicated that he knew the first names of the friends with whom he had been drinking and knew the area in which they lived, but did not know their last names.

After the defense rested its case, Minwer Ballota, a gas station attendant, testified during the State's rebuttal that he first saw defendant at his gas station on June 5, 1980, approximately 12:50 a.m. At that time, defendant was carrying a gun, approximately 15 to 18 inches long. Ballota then identified the gun defendant had been carrying as one of those recovered from the brown vehicle.

After closing arguments and instructions to the jury, the jury returned with its verdict of guilty of armed robbery and armed violence. Defendant's subsequent motion for a new trial was denied. Following a hearing in aggravation and mitigation, the court sentenced defendant to 20 years in the Illinois Department of Corrections. Defendant's timely appeal followed.

OPINION

■ We first address defendant's contention that complainant's inadmissible show-up identification so tainted the subsequent photographic and in-court identifications as to render them also inadmissible.

At the outset, we dismiss as factually distinguishable the United States Supreme Court decisions mistakenly relied upon by defendant. First, in both *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, and *Foster v. California* (1969), 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127, testimony at trial regarding a prior illegal lineup identification was held to be the direct result of the illegal lineup and, thus, inadmissible. In the case at bar, complainant never made reference to the inadmissible show-up identification at any point in her testimony. Second, *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, addressed the inadmissibility of evidence derived from an unlawful entry and an unauthorized arrest. In our case, the legality of defendant's arrest is not an issue. Third, *Nardone v. United States* (1939), 308 U.S. 338, 84 L. Ed. 307, 60 S. Ct. 266, concerned photographic identification that had become so attenuated from a prior illegal identification as to dissipate any taint and be admissible. In the case at bar, attenuation was never an issue. Rather, the trial court found that the subsequent identifications were admissible on the ground that the State had established an origin independent of the suggestive show-up.

It is axiomatic that once the defendant has established that a pretrial confrontation was impermissibly suggestive, the State may over-

come the obstacle that ruling presents by a clear and convincing showing that a reliable origin of recognition exists for subsequent identifications independent of the suggestive confrontation. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.) As a guideline to determining the reliability of the independent origin, the Illinois Supreme Court set forth the following factors which must be considered in evaluating the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation; and (6) any acquaintance with the criminal prior to the crime. *People v. McTush* (1980), 81 Ill. 2d 513, 521, 410 N.E.2d 861.

Applying the aforementioned factors to the case at bar, we conclude that the trial court was correct in finding that an independent origin of reliability existed for complainant's photographic and in-court identifications. First, complainant testified that Ed's Grill was brightly lit with two fluorescent lights which extended the length of the counter. Further, defendant sat one stool away from complainant and confronted her face-to-face. He was not wearing any type of mask.

Second, although Anderson was also in the grill, complainant's attention was primarily directed toward defendant. He, after all, was the one who had a sawed-off weapon pointed directly at her and the one who had demanded the money.

Third, complainant's description of her assailant given to the police immediately after the robbery was accurate and uncontradicted by later testimony. Defendant contends that complainant was not "able to identify her assailant with any certitude until she had been prompted into a one-on-one confrontation at the hospital," and that her "identification *** was remarkable in the spareness of her description." The record does not support this contention. In fact, complainant described her assailant as a black male, about six feet tall, 175 pounds, between 25 and 30 years old, with a mustache, medium afro and no scars. She then proceeded to describe what both defendant and his companion had been wearing and what their weapons looked like. Contrary to defendant's contention, we find complainant's description remarkably thorough and accurate. Defendant attempts to exploit the fact that at trial he had a very noticeable tattoo about which complainant had failed to comment. We find the absence of testimony regarding the tattoo irrelevant for the simple reason that it

was never established that defendant had had the tattoo at the time of the robbery.

Fourth, at no time did complainant hesitate in her identification of defendant. Fifth, only one day elapsed between the robbery and the photo identification. Finally, complainant testified at trial that she had been acquainted with defendant for approximately five years as a customer of the grill and had waited on him approximately 20 times during that five-year period. Moreover, she specifically remembered defendant because of his arrogant, rude behavior on several occasions.

Therefore, based upon the foregoing analysis, we conclude that the trial court properly ruled that the photo identification and in-court identification had reliable origins of recognition independent from the suggestive show-up.

■ Defendant next contends that the State's inflammatory and factually erroneous statements made during closing argument prejudiced defendant's right to a fair trial. Specifically, defendant cites the following alleged errors as a concerted attempt by the State "to prejudice, inflame or create sympathy in the minds of the jurors": (1) reference by the State to the absence of alibi witnesses for defendant; (2) State's suggestion that defendant used the robbery proceeds to pay gambling debts; (3) State's abuse of the court's decision that no reference could be made to the injuries incurred in the vehicle collision; (4) the State's improper bolstering of complainant's credibility; (5) the State's charge of deliberate misrepresentation by defense counsel; (6) the State's suggestion that defendant was involved in a chop-shop operation; (7) the State's comment that defendant could freely admit to stealing the automobile because he was not on trial for that crime.

Upon reviewing the record, we find that defendant has waived review of the first five alleged errors by his failure to object to them at trial (*People v. Lucas* (1981), 88 Ill. 2d 245, 250, 430 N.E.2d 1091) and to raise them with specificity in his post-trial motion. *People v. Bell* (1975), 27 Ill. App. 3d 171, 176, 326 N.E.2d 507.

Defendant concedes that he did not make timely objections to these errors, but maintains that because of the highly prejudicial effect of the State's comments during closing argument, this court should invoke the doctrine of plain error as an exception to the rule of waiver and address the alleged errors in their entirety. We disagree. The doctrine of plain error may be invoked in criminal cases where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial. (*People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091.) We do not find that either of these prerequisites has been met in the case at bar, and, thus,

find no reason to depart from the general waiver rule.

Regarding those comments to which there were objections at trial, we note that defendant did not set forth these objections in his post-trial motion with the requisite specificity. Illinois law requires that both steps be taken in order to preserve an issue for appeal. (*People v. Lucas* (1981), 88 Ill. 2d 245, 250.) We are fully cognizant that defendant raised a general objection to the State's closing argument, but we do not find it to have been sufficiently specific to have afforded the trial court an opportunity to rule on the alleged errors. *People v. Bell* (1975), 27 Ill. App. 3d 171, 176, 326 N.E.2d 507.

We note, however, that even if the allegedly erroneous comments regarding the chop-shop[1] and stolen vehicle[2] had been properly preserved in the post-trial motion, when viewed in light of the entire record and argument, they neither constituted a material factor in defendant's conviction nor resulted in substantial prejudice to the defendant so as to warrant reversal. *People v. Adams* (1982), 111 Ill. App. 3d 658, 666, 444 N.E.2d 534.

Defendant next contends that the State failed to prove him guilty beyond a reasonable doubt. He asserts that the evidence against him consisted primarily of complainant's tainted identifications which, even if admissible, were insufficient to sustain his conviction.

Preliminarily, we note that this court will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342, 385 N.E.2d 671.) In the case at bar, we do not find that defendant has met this standard for reversal. It is well settled that positive identification by a single witness who had ample opportunity to observe is sufficient to support a conviction. (74 Ill. 2d 329, 343.) Moreover, circumstantial evidence is also sufficient in itself to support a conviction as long as it leads to reasonable and moral certainty that the accused committed the offense. *People v. Einstein* (1982), 106 Ill. App. 3d 526, 532, 435 N.E.2d 1257.

In the present case, there are not only two instances of admissible

---

[1]"Mr. Davis [defense attorney] said his client got up on the stand and he admitted to stealing a car. He called it joyriding and as he explained to you in so much detail that the conviction was for possession of a stolen motor vehicle, which could mean joyriding. Well, ladies and gentlemen, I submit to you it could also be running a chop shop—."

[2]"The defendant is not charged with possession of a stolen motor vehicle so he can get up there and admit all he wants to it. You cannot convict him of it because it's not before you. He can get up there and admit to anything."

positive identification of defendant as the perpetrator of the crime by the sole eyewitness, but there is also an overwhelming amount of circumstantial evidence supporting defendant's conviction. Paramedic Frank Miulli corroborated complainant's testimony as to what defendant and his companion were wearing on the morning of the robbery and also identified the sawed-off weapons and blue jean jacket as the items he saw removed from defendant's automobile after the accident. Earlier, complainant had identified the same weapons as those used during the robbery and had identified the jacket as that worn by defendant's accomplice. Officer Daniel Chorowicki also identified the sawed-off weapons as those he saw a paramedic remove from defendant's automobile and identified the blue jean jacket as the one worn by defendant's accomplice. Further, Chorowicki identified defendant at trial as the driver of the vehicle in which the weapons had been found. Officer Gary Zuelke testified that he had been engaged in an automobile chase with defendant several hours after the robbery and had witnessed the collision involving the automobile that defendant had been driving. At trial Zuelke identified defendant as the driver of the auto he had been chasing and also identified the sawed-off weapons as those given to him by a paramedic who had removed them from defendant's auto. Further, Zuelke testified that he had found a large amount of change and a magazine entitled "Craft" on the floor of defendant's auto.

Accordingly, based upon the positive identifications made by complainant and the clear and convincing testimony of the State's witnesses, we conclude that defendant's guilt was established beyond a reasonable doubt.

■ Defendant next contends that the trial court erroneously entered judgment and sentence on his convictions for the crimes of armed violence and armed robbery, as both arose out of identical acts. The State concedes that entering judgment on each conviction was improper and concurs with defendant that the conviction for armed violence must be vacated. We are in accord. Pursuant to *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477, convictions cannot stand on both an armed violence charge and its predicate offense. Rather, judgment must be entered and sentence imposed only on the more serious offense. (91 Ill. 2d 164, 170.) Accordingly, because armed robbery is the more serious offense (*People v. Jones* (1980), 89 Ill. App. 3d 1030, 1034, 412 N.E.2d 683), the conviction and sentence for armed violence must be vacated.

■ Defendant next contends that the trial court erred in enhancing defendant's sentence on the basis of perjury perceived by the judge

to have been committed by defendant during the trial. Upon imposing sentence on defendant, the trial court discussed some of the factors which it had taken into consideration:

"I believe that the Defendant did not tell the truth when he was on the stand. I believe that he has a disregard for life by not taking into consideration the reckless homicide; but I do recall on the stand that Mr. Surrels [*sic*]—saying he did not even know what speed that he was going in that car; but he was trying to get away from that squad car.

Considering the weapons that were used, a sawed-off shotgun, and a sawed-off automatic rifle, a rifle that can hold—I don't know exactly how many, but it can hold a lot of ammunition. \*\*\*

The other weapon involved here was a shotgun. One of the most vicious types of small arms that anyone can be up against at close range was used. This is a weapon—there was no useful purpose in this case.

The Defendant has had behavior difficulties in high school. The PSI indicates that. The Defendant was constantly getting into trouble.

And those Judges, in the past—each and every time though[t] that he should be incarcerated for a period of time, usually six months."

Initially, we note that defendant failed to object to the trial court's consideration of defendant's perceived perjury, and did not raise it as an issue in his motion for a new trial. Absent evidence that defendant was prejudiced by an alleged error to which no objection was made, the general rule followed by this court is that defendant has waived the right to assert the issue on appeal. (*People v. Lucas* (1981), 88 Ill. 2d 245, 250, 430 N.E.2d 1091.) Upon considering the numerous factors articulated by the trial court as having entered into its sentencing decision, we do not find that the trial court's consideration of perceived perjury on the part of defendant prejudiced defendant in any way. Therefore, we find no reason for departing from the general rule that issues not properly preserved for review are waived.

■ Lastly, defendant contends that the trial court erred in imposing a general sentence where there has been a conviction on two counts. In response, the State argues that defendant waived this issue on appeal by his failure to object at the sentencing hearing or to raise the issue in his motion for a new trial. *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 590, 444 N.E.2d 662.

In accord with our previous findings in this opinion regarding waiver, we concur with the State's position in principle. However, in light of our decision that the conviction for armed violence must be

vacated as well as the absence from the record of any indication that the trial court intended the 20-year sentence to encompass concurrent 20-year terms for armed robbery and armed violence, we conclude that the cause must be remanded for new sentencing. See *People v. Blakeney* (1978), 59 Ill. App. 3d 119, 125, 375 N.E.2d 1309.

■ Finally, the State requests that pursuant to section 8 of "An Act concerning fees and salaries ***" (Ill. Rev. Stat. 1981, ch. 53, par. 8), section 110—7(h) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 110—7(h)) and section 13 of division XIV of the Criminal Code of 1874 (Ill. Rev. Stat. 1981, ch. 38, par. 180—3), this court grant costs to the State and incorporate same as part of its judgment in the amount of $50 for defending the appeal and an additional $25 for oral argument.

In our original opinion authored by Justice Wilson, now deceased, we granted the State's request for an appeal fee of $50 and denied its request for an additional $25 for oral argument. Oral argument was in fact heard in the instant appeal. However, our denial was predicated on an interpretation that the *per diem* provisions applied only to the actual trial in the circuit court, and not to the oral argument on appeal. The State has filed a petition for rehearing contending that this court incorrectly construed the term "trial" in the relevant portions of the statute which reads:

> "State's attorneys shall be entitled to the following fees, ***:
>
> * * *
>
> For each day actually employed in the trial of a case, $25; ***." (Ill. Rev. Stat. 1983, ch. 53, par. 8).

We agree and have therefore granted rehearing.

In *People v. Nicholls* (1978), 71 Ill. 2d 166, 179, 374 N.E.2d 194, 199, the Illinois Supreme Court expressly addressed this very issue and held:

> "We believe that the *per diem* allowance, not being limited to the circuit court proceedings, may be reasonably construed as also applying to oral argument in the appellate court."

Accordingly, the judgment entered by the circuit court of Cook County for armed robbery is affirmed; the judgment for armed violence is vacated; and the cause is remanded for new sentencing. Further, we grant the State's request that defendant pay a fee of $75 to the State for defense of this appeal.

Affirmed in part; vacated in part; remanded for sentencing; fee allowed.

LORENZ, J., concurs.